The case on the oral argument calendar for today, so we might as well get started here. And Mr. Langley, for Mr. Langley, we will hear from Mr. O'Briddy. Thank you, Your Honor. May I proceed? You may indeed. It's tea time. Yes, Your Honor. The plan at issue in this case as an exclusion for, quote, any person whom the administrator determines is compensated by special fees. The main question in this case is whether or not the plan administrator abused her discretion in concluding that Mr. Langley fell within that exclusion. There's five reasons why the answer to that question is yes, the plan administrator did abuse her discretion. The first reason is there's simply no concrete evidence in the record that Mr. Langley was compensated by special fees. There's not a single document in the world that opposing counsel will point to that says at any time prior to their seizing on that phrase in order to deny him benefits that the company ever perceived him as being compensated by special fees. As you know, a hallmark of an abusive discretion is if there's no concrete evidence in the record to support the plan administrator's decision. There is no concrete evidence in the record to support the plan administrator's conclusion that Mr. Langley was compensated by special fees. What does the record show about how he was compensated? The record shows that he was compensated as a normal at-will employee, received a normal paycheck, received bonuses. The one thing that they seize on to try to argue that in fact he was compensated by special fees is Exhibit 6 to the record excerpts, which is a 2006 memo from April 2006 before the plan ever existed, before the Howard Hughes Corporation bought the company he worked for. What it says, Your Honor, is that, specific as to the issue here, is that there's two country clubs Mr. Langley managed at the time. It says if either of those country clubs are sold, he can get up to a 1% bonus, that's the word they use in the actual document itself, bonus. It turns out the next year one of the clubs was sold and he received the 1% payment, and when they paid it to him, as reflected in Exhibit 7 to the record excerpts, they called it a commission. My point is, at no time did they ever refer to the very payment that they're relying on to claim he was compensated by special fees, at no time prior to his making a claim in this case. What's the difference between a commission, a bonus, and a special fee? Is there somewhere a distinction made as to, there was extra money beyond his salary, but how do we know if it was a special fee or a commission or a bonus? Well, I mean, I think we could, one thing is we can go by their plain language. They chose the words, it's not unfair to hold them to those words, especially because of this point, Your Honor. The plan, this is critical, the plan expressly addresses bonuses and commissions, which is how they refer to the payment in the actual document and when they paid them. And what the plan says, and this is in Article 3.2, is it says, in calculating the severance amount, a bonus or commission is not included in the calculation. In other words, it does not, as they allege in this case, knock Mr. Langley out of coverage under the plan altogether. It just means if he gets a bonus or a commission. They're going to deduct it. Right. They're not going to include it in the base rate. His calculation of severance is based entirely on his base salary and any other compensation like a bonus or commission is not included in it. And when we came up with the amount that he's owed, $255,000, we followed that. And so that's critical, Your Honor. Now, to answer your question specifically, go ahead and answer his question if you haven't answered it. Okay. Well, the answer to your question, I think, ultimately turns on this Colder case, Your Honor. Because you say, well, what does a special fee really mean? How do we know that it's different than a commission or a bonus? Well, one thing is, it does seem odd that using their own language, bonus or commission, he wins. Right? Because the plan says he still gets his severance, we just don't include the bonus or commission in calculating his severance. So it's awfully... Right. Is it correct that the administrator's decision to say that he had received a special fee or that he was paid according to special fees relates to the commission that he would have received if they sold the country club? They're making two arguments. They're saying in 07, one of the clubs was sold and he did get a special fee. I'm saying that. And then the second club... In 07, that was before Baker took over and Howard Hughes took over. Correct, Your Honor. They're also saying he could have gotten another one, although he never did. He could have gotten another one if Howard Hughes now sold the club. Is that what he's saying? That's what they're arguing. That if Howard Hughes sold the country club, is that the only asset that the Woodlands has? No, they have other assets. He was just managing that one club at the time. The country club is only one of the assets that Howard Hughes purchased. Of course, yes. So if Howard Hughes decided to sell the country club, they're saying that he would be entitled to the 1% fee that he agreed with, with Woodlands? But I understood that whenever he asked whether he would still be entitled to that, they said they did not know because the agreement that he had signed with Woodlands, I mean had arranged with Woodlands, was unsigned. Is that correct? Yes. That's the record evidence that Mr. Langley testified to that later on. They never committed to that, is what I've read in the briefs. I think that's right, Your Honor. I think even the bigger point is, let's say you assume that they're right, that if the second club that he managed was sold, he would have gotten a 1% commission, as they called it, or a bonus, as they called it. Suppose that's right. Well, that's a future possibility that never occurred. Remember, the plan language is, any person who the administry determines is, is compensated by a special fee. Is is a present tense term. So he's seizing on a payment he got seven years earlier, or a payment that he supposedly, I don't even believe he could have, but let's go with that, supposedly could have gotten if something else had happened in the future. That is not a person who is compensated by special fees. But whenever Hughes bought the place, or bought the company, everybody there just continued on the Woodlands pay scale plan and benefit arrangements. They didn't change, in other words, Hughes did not have its own pay system that it, that it adopted when it took over Woodlands. Well, no, actually, Your Honor, that's wrong. That's wrong. Tell me what the situation is. Okay. The situation is, they actually passed, Howard Hughes passed a resolution in 2011, after they purchased the Woodlands operating company, and the resolution canceled all bonus plans. So it seems kind of, I couldn't, you talk about bad faith, that's one of the things you look at in an ERISA plan, how they conveniently say, well, notwithstanding that resolution, somehow this special fee that we call an agreement survived the resolution, and therefore he could have gotten this payment. So what, I mean, so your position is that they are going, relating back to Woodlands to assert this special fee, which had, in fact, been abrogated by their own personnel department? Well, that, that is one of my arguments, Your Honor, yes. Is that true? Yes, I think that is true, but my position is more than that. My position is, even if that was a special fee, which it's not consistent with a fair reading of the plan to call it a special fee in 07, even if that was true, the plan administrator would have abused her discretion if in 2013, six years later, she concludes that he is a person who is compensated by a special fee based on a payment that occurred seven years earlier. Do you understand? Well, and another pay system that had been abrogated. Well, that's, that's icing on the cake. I don't know, it might be the cake. The other problem, Your Honor, is, and this goes to the fair reading issue, is they argue that this agreement from 06 is really a disguised severance plan, and so in other words, if that second club had been sold, which it never was, and he got that 1% payment, oh, it was sold in 2015 after he was fired, and it was $25 million, he would have gotten $250,000, but he wasn't there, okay? But they're saying, if he'd gotten that, well, that would have been its own severance plan, and therefore, the administrator reasonably knocked him out of the official severance plan. I mean, that, I don't, I don't, I quite understand your argument, in the sense, you're telling me, though, that, uh, if he had been there, when the $25 million is, is, was sold, there was no arrangement that he had with Howard Hughes to get the $250,000. I am telling you that, Your Honor, but what I'm saying is, let's just, for purposes of You're kind of falling all over yourself on that. Well, I'm sorry, Your Honor, I'm just saying, let's go with what their argument is. I don't agree with it, it's contradicted by the record evidence, but let's assume that they're right, that if he was still there, and the club was sold, he would have gotten this 1%. Let's just, I don't agree with any of that. The record contradicts it, Your Honor, you're right, that is my argument, but let's, let's pretend that that's accurate. The problem with their argument is it, it would not knock him out of the severance plan that he's suing under, because, and they don't ever mention this, in Article 3.1B of the plan, it expressly says that a payment of separation benefits under any other contract or arrangement merely acts as an offset against the plan. It doesn't knock him out of the plan entirely. So in other words, if he'd been there in 2015, and if he'd gotten the 1%, which, Your Honor, I don't believe the record supports that he had any entitlement to, and had been abrogated by the resolution, but if that had happened, he would have gotten 1% of $25 million, which is $250,000. Then, according to their own argument, he would have gotten $5,000 under the plan pursuant to Article 3.1. It would not have entirely knocked him out of the severance plan. So their argument is not consistent with a fair reading of the plan, which, by the way, Mr. Langley was a vice president, and the plan expressly covers vice presidents. When the court acquires this company, I'm not familiar because I'm too old to be familiar. When you acquire an LP, does the company come over intact, assets and liabilities, contractual arrangements and everything, or was it an asset deal, or what? That might be, I'm not sure if that's answered in the record. That might be a better question for opposing, because my understanding, they wholly acquired the Woodlands Operating Company, and they did not integrate it into Howard Hughes. It remained as a wholly owned subsidiary. So it's a distinct company. It just happens to be owned by Howard Hughes, and the plan, if you look at the plan, it says the Woodlands Operating Company employees are covered by this plan. The next point I wanted to raise, Your Honor, is the issue of the conflict, and I think this is an important point. I know conflicts vary in importance. Some are not significant, and some are. The one here is really significant. Here's why, Your Honor. It's more than a structural conflict. The plan administrator works as the director of human resources for Howard Hughes. Howard Hughes funds the plan. So unlike in your Holland decision, it goes directly to their bottom line. But it's more than that. It's a lot more than that. Specifically, they make a big point of how Mr. Langley was this high-level vice president. Well, he was fired. The general counsel, Peter Riley, of Howard Hughes, was personally involved in his termination. This is in the record at pages 237 through 239. And the executive vice president of Master Plan Communities was also involved in his termination, Mr. Paul Lane. And when Mr. Lane came to him and he told him, you know, we're getting rid of you, not withstanding this fabulous performance review you just got. And Mr. Langley said, and he swore this under oath, and it's in the record at page 239, and it's undisputed testimony. He said, if you want to fire me, you need to adhere to the company's severance policy. Mr. Lane replied that he did not know what the company's severance policy was and asked Mr. Langley what he would be entitled to under the policy. Mr. Langley told him he'd be entitled to $255,000, which is accurate. Mr. Lane became visibly agitated and upset and said, Bill, I'm only going to ask you this one time, what would it take? The next day they fired him and offered him $42,500. Now my point is this, do you really think, if anybody spent time in corporate America, do you really think this director of human resources is going to essentially overrule these high-level executives at the company who've already unequivocally told Mr. Langley he's not getting anything under this severance policy that they didn't even know about? That is not just a structural conflict, that's a personal conflict and it's deep. Now was it cured by the retention of Mr. Brennan Riley, which the plan administrator referred to as my attorney, an attorney for the plan administrator, not attorney for the beneficiaries of the plan? Well that's all we know. The plain language of what I just said is that there's a conflict and this Mr. Riley was the attorney for the plan administrator, not the plan beneficiaries. Now they say, well that's just loose language and we didn't really mean it. Well who has access to Mr. Riley and who has access to the evidence that would actually show whether or not he's truly independent? His retention agreement, his emails with the plan administrator, an affidavit from Mr. Riley. I don't have any of that. The defendant has all that and they chose not to include any of that in the record so it's reasonable to infer that in fact there is a conflict and it remained unmitigated and in fact not only is it reasonable to infer, but in fact that's what the record reflects. I have one question. Yes, Your Honor. Before you sit down. Yes, Your Honor. On this objection to the fees, did Howard Hughes object to the amount of the fees when the district court awarded them? Howard Hughes sought the fees and obtained the fees. Well, no. Was there, I'm sorry, was there an objection? By me? Yeah. Oh, absolutely, Your Honor. I objected to both. The amount. I objected to both awarding any fees and the amount of the fees and it's all set out in the record. Okay. Thank you. Okay, Mr. Obrado. You've saved some time for rebuttal. First we'll hear from you, Representative Howard Hughes. Please, the court. Scott Brister with Andrews-Kirsch, Kenya. I appreciate the court staying around an extra day because of my family situation. So the question in this case is whether a manager who has a golden parachute should get a second parachute from his ERISA plan. If the ERISA plan explicitly requires a second parachute, then the answer is yes, but this plan did not explicitly require one. If top managers get two parachutes, there may not be enough parachutes for everybody else to go around. I use the term golden parachute. Where's the evidence that establishes that he had a parachute? Because, I mean, this is what I've read in the briefs, is that that was never affirmed. That was something that occurred under Woodlands and was never affirmed by Howard Hughes. No. It's in the record in the administrator's denial. What the administrator says she had confirmed with both the employer and the plan sponsor, which is the same person, that the club sale incentive award continued to apply to Langley at the time of his termination. That was after he was fired. Right. But he says before he was fired that that was never confirmed, and they said we don't know whether it is still viable, and then we understand this morning that we were told that Howard Hughes expressly abrogated all bonuses once it took over the Woodlands group. There's not a stitch in the record that says that. That's totally unsupported. The unsigned agreement said you have these cash, there were some annual cash bonuses that covered through 2008, and those he got an explicit notice that said that's withdrawn. There's nothing in the record that says the sale incentive award was ever withdrawn. Plus, he's already. I know they didn't say that specifically, but they did say they did withdraw certain bonuses. Did they expressly say that all other bonuses remained viable? They didn't say one way or the other, but they took over the company. It wasn't an asset sale. They bought the company. And so the contract's been partly performed. He's there. And I use the term golden parachute because of the context. There's an ironic twist in this case. The term golden parachute was invented first in print when the creditors of Trans World Airlines, TWA, wanted a guy to try to wrest control of TWA from, guess who, Howard Hughes. And the guy wanted some guarantees in case he was the one that got kicked out of the airline instead of Howard Hughes. And I suppose that's because it was an airline. That's why golden parachute became the term of art. But golden parachute is, look, when you have a change of control event, then the line employees are not all going to be fired because there's usually not. Some of them may be. But the top management almost always is because you want your own people in there controlling. This guy was the boss. There was two clubs. And just like the Woodlands Corporation, Howard Hughes Corporation is not in the business of running country clubs. Our business is real estate development. So everybody knew, including Mr. Langley when he started, we buy or build country clubs and golf courses and developments, and then we sell them. We're not in the business of running country clubs. So to attract somebody to manage a top flight club like that, he needs some guarantees that when we sell, which everybody knows we're going to do, he's going to get something when he leaves. And that's what this award was. Did you have such an arrangement specifically with Howard Hughes? There was no new arrangement signed, but as I said, we didn't sign a new. Any arrangements signed previously with Woodlands between Langley and Woodlands? The record has only an unsigned copy, but, of course, two things. Unsigned copies, you don't have to sign. Contracts don't have to be signed. Contracts can be oral. They can be written and not signed. And once they're performed on one side, which he did by working and selling one of the clubs, they're binding. But second thing, the deal is the planned administrator's discretion is to consider whether this person has a special fee or a special contract or a special arrangement. And this guy had a special arrangement. And the administrator confirmed that. So, yes, it's after he was terminated, but she confirmed that. And, of course, the answer is he's already gotten $340,000, yes, before we took over, but he got it. And as Judge Hughes says. Was his major compensation the base salary or the special bonus compensation? Well, I mean. Didn't he have a base salary, and that was what he was getting, and then he got some bonuses on top of that? Or was the arrangement that we're going to especially pay you a special fee, wasn't the base salary the regular salary that he was getting? Sure, he got both. He got a base salary, which there's nothing in. That did not change when Howard Hughes took over. He kept getting the same base salary. We did change the bonuses, but he kept getting the same base salary that he was before. We didn't rewrite everybody's contracts. We didn't change everybody's stuff. We took over the company. He kept getting $255,000 in his last year, plus another $75,000 bonus, plus a deal if a change of control event, a golden parachute that he gets a one percent. And so the question, if the clubs are sold. So the question is, the plan says. My understanding is that the administrator hung her hat on the arrangement that he had if the clubs sold. That was a special arrangement that served to deny him any coverage under the ERISA plan. Her denial relies on both special fee and special arrangement. She says it's not a special contract. What is special? But the special fee and special arrangement are indistinguishable. They're the same thing. But it's whether it doesn't have to be a contract. It's an arrangement or it's a fee. And is this a special fee? I don't know about you, but I've never gotten a $340,000 bonus, and I work at a big law firm. It seemed kind of special to me. We give those out at Fifth Circuit every year. If that's so, if that $340,000 he got and the $251,000 he would have got if he hadn't messed up, if that's not a special fee, what is? Furthermore, the plan says the administrator, the plan excludes anybody who the administrator determines is compensated by special fees or employed pursuant to special contract arrangement. So Mr. Langley's counsel says, well, but the $340,000 check didn't say special fee. What the plan has to pay is determined by what the plan says, not what the previous check stub said. It's what the plan says and what the administrator says. And that was fairly impressive to me that the status of Mr. Langley had been previously determined by the executives of the company before the administrator made the decision that simply endorsed what they had earlier said in a heated discussion with Langley. Well, that's almost always going to be the case. The lion's, as the Metropolitan Life case says, the lion's share of ERISA plans, the administrator is a company employee. Now, that's just the way it works. So the separation of benefits is only going to come up when the guy has been terminated. So the administrator doesn't overrule that. I mean, there's a lot of ERISA plans with medical and all this stuff, but pension plans, this only comes up when the guy has been fired. So this is always going to be the case. But the Metropolitan Life report says we take it into account. You do. And we take it into account. I mean, it has a sliding scale that we apply. And the way it's been described to us here, the scale would seem to tilt pretty strongly in the fact that a conflict of interest is a salient factor here. It's always a factor. But Holland says, this court's Holland opinion says, you consider two things because this is almost always the case, this conflict, this structural conflict almost always exists. One, do you have any history or pattern? There's nothing in this record about history or pattern, and there wouldn't be because this guy, this was a one-off contract. The steward at the country club or the golf caddies weren't getting one percent of the sale if the club was sold. This was a special deal for the boss. If it existed, that's the point. If it existed. There is no evidence. First of all, it's the administrator's call whether it existed, not this court. Second of all, there's no evidence in the record it didn't. All of his evidence is they said somebody at the company said he didn't know. There is no affirmative evidence that he didn't know. There is evidence that other than the administrator's post-termination, self-serving conclusion that it was in effect. That's the only evidence of it that I have been advised of. Well, that's, respectfully, that's the administrator's call. I understand that. That's not this court's call. This court can say you don't have discretion to do things that aren't tied to the facts, but she says. She is not entitled to make up facts. We know that. And there's no allegation that she made up the fact that said, where she said, the employer confirms that it is, what was the language, confirms that it continued to apply to him at the time of termination. What's that? She said how she confirmed it. I'd have to look back and see. It's a short denial letter, but I think she just says the employer and plan sponsor confirmed that it applied at the time of his termination. Unless we're going to take depositions and stuff, which we don't require administrators to do, that's all you're going to have. And then on the independent review, there's no evidence at all that this guy wasn't independent, that his pay was dependent on what his opinion was. Langley hangs that on two things. She refers to him as counsel to the administrator one time. In another place she says, if you have any questions, call my attorney. Well, independent counsel is counsel to the administrator. That's why you hire an independent counsel, to give counsel to the administrator. And when she says, please contact my attorney, that's like me saying, please contact my secretary. That doesn't mean, well, or well, but, you know, this is what, say, when the head of the company, you know, we represent a company. The company boss says, don't talk to me. We're involved in litigation. Talk to my attorney. In fact, Andrews-Girth is not his attorney. Andrews-Girth is the company's attorney. But we don't hang this on something like that. And to the contrary, Langley in his original complaint said, I want to get discovery from that guy because he's not her attorney. This is in his original complaint that he filed. It's not she's, this guy is attorney for the beneficiaries, not her. So he wasn't fooled. He knew what the situation was. Let me just address briefly the breach of fiduciary cases. And I have to say, these are a little confusing to me. I'm not, I understand. Cigna says, okay, you can get a surcharge if you're misled by the summary, and I'm not clear what the boundaries are when you've gotten to the point where we're using breach of fiduciary duty to rewrite the plan. But I did note this. All of the cases that say the summary might give you a breach of fiduciary duty claim, there was an affirmative misrepresentation in the plan summary or the employer that was not true. So in Cigna, the summary affirmatively said, yes, we're switching from a defined benefit plan to a defined contribution plan, but it's not going to cut your benefits and it's not going to cut our contributions. Well, it did both. So if you firmly tell them in the plan, in the summary, we're not going to do something, and then the plan does it, I can see a good ground for everybody saying you can't do that. The Geralds case, Geralds v. Energy Services, from this court in 2013, 709F3R48, they affirmatively told and wrote to the employee, you're going to be covered by our medical benefits plan. Well, he wasn't, and so he didn't get covered under his wife's plan. If the summary affirmatively says you're not going to get paid or you are going to get paid and then you don't, that's a place for equity to step in. We never affirmatively told him he could get both severance benefits and the sale incentive. His complaint is just the opposite. You never told me I couldn't get both. We never told him he could get both. His argument is the summary was silent. But if that's enough to get a breach of fiduciary duty claim, then the summary is going to have to include everything in the plan. I thought the summary did say that people under some kind of special arrangement. It did. It said if you're not eligible to participate, the summary said, if at the sole discretion of the plan administrator or you're an independent contractor or in any other employee group or classification not eligible to participate in the plan. Well, now who does that? I think if the summary says that and you're an average employee at the club, you might not be in notice that you're in a special classification. But this was the boss. The boss knows. I'm going to put somebody on notice at least that am I in the special group. Right. And the boss knows that. I mean, we all know that judges don't get paid for overtime for working more than four hours. Neither do junior associates or law clerks because they know they're not regular employees. They know special rules apply to them. And this guy should have known the same. Just one thing on attorney's fees. He says, you know, our fees are too high. Well, Andrews-Kirk's fees are pretty high. I'll admit that. But it has to be for clear error. And opposing counsel had this case on a contingency fee, which at this point means he would get 50% since he's suing for $255,000 minus $42,500 that we offered him his client when he left. His contingency fee is over $100,000 too. So this is in the zone of reasonableness. Unless the court has another question, I'll close with one brief analogy. So for 12 years I've lived in Austin, and I drive 28 miles down from Georgetown to downtown on I-35. And I've learned there are two kinds of drivers in a traffic jam. There's kind and forgiving drivers who let people cut in line, and there's all the rest of us who are behind them thinking, don't let that guy in. And the problem arises because the person who's being kind sees the person they're being kind to but doesn't see all the people they're not being kind to because they're tiny little bits in the rearview mirror. Part of the reason ERISA fiduciaries have discretion is because they owe duties to all plan members. You can't just look at one applicant. You have to consider all the future ones. And if this isn't a special fee, if this isn't an arrangement, if the administrator has to decide that this guy would get two golden parachutes, there's not going to be enough parachutes left for everybody else. Understand his argument is, well, but that was years before. But if it's not a special fee, it's not a special fee. It was the day before. According to his argument, if we sold the second club on one day and terminated him the next day, their argument has to be the same. It's not a special fee. He gets $250,000 twice. That's what their argument is, and the administrator has to have the discretion to say, that's not what this plan says. Thank you, Mr. Mercer. Mr. O'Brady? Yes, sir. I'm going to try to make four points. Honestly, this defense is like a bad game of three-card Monty, and my client's the victim. There's no double recovery here. He didn't get any recovery. He didn't get the payment for selling a club because the club wasn't sold. I understand. But it seems to me that if, I mean the question in my mind is if it were a viable arrangement, and he understood and clearly knew that if they sold that club and understood that Howard Hughes was kind of in the business of developing and selling these clubs and there's a reasonable prospect that he was going to get it, then that would be a special arrangement. Well, Your Honor, two things. One, it would be a special arrangement. I agree, but he leaves out the full clause. The language that the plan administrator has to apply is any person who the administrator determines is compensated by special fees or employed pursuant to a special contract or arrangement. Or. Right, or employed pursuant to a special contract or arrangement. He wasn't employed pursuant. Right, but he wasn't. They're saying there's a special arrangement for a special fee. That would be compensation, a special arrangement about compensation. The language of the plan requires them to show that he was employed pursuant to a special arrangement. He was not employed pursuant to a special arrangement. He was employed at will as their own records reflect. The second thing, Your Honor, is you make a great point. There is no concrete evidence in the record that the resolution that somehow this special fee arrangement from 06 survived the purchase and their resolution that canceled all the bonus plans. If you look at record page 344 and 371, the administrator just says, Well, I've talked to the plan sponsor. They've confirmed it survived. Well, that's entirely conclusory and pretty self-serving, okay? On the other hand, Mr. Langley, the not a stitch of evidence, well, his affidavit is in the record at 365, and it says exactly what you said that it said. So there is a stitch. The bigger point, though, I don't want to lose sight of this, is that he's wrong with what he finished with. Our argument would be just follow your plain language. If the club was sold, the second club was sold right before he was terminated, our argument would be follow your own argument, which is he would get the $250,000, if it was sold for $25 million, and then, pursuant to Article 3.1 of the plan that says any other payment of separation benefits under any other contract or arrangement is an offset. He wouldn't get both. My question is, is the money that he would get for his commission, so to speak, is it really an offset under that language? Well, it is. There's an argument that it wouldn't be. I'm just saying if you follow their position, that's exactly what it would be, so he'd be entitled to. Is it a separation? I don't think it is. No, it's not. I mean, you can read its plain language. It says nothing about it. I'm just saying if you agree, and the district court agreed with them and said this really is a separate separation agreement. So I'm saying let's assume that's all correct. I still win because their own plan says it's merely an offset. The last point I want to make, Your Honor, is on the issue of Kohler. Now, Kohler is a case that says if there is an ambiguous plan provision, and that's what the case turns on, you look at the summary plan description and give it the interpretation as close as possible to the summary plan description. Nobody knows what a special fee is. In the history of jurisprudence, I couldn't find a definition. A reasonable person, if told by a potential employer, you'll be compensated by a special fee if you get a job here, would say, what does that mean, right? So Kohler applies. We follow Kohler, and we look to the SPD, the summary plan description, and try to give special fee a meaning most consistent with the summary plan description. The summary plan It ended your case. I mean, if we held that the administrator abused her discretion, how does the fiduciary claim come into the case? Okay, that's an alternative claim. If I win Completely alternative. It's completely. Okay, back to Kohler. The summary plan description only excludes contract laborers and independent contractors. He's saying that the boss should have known that he was a contract laborer or independent contractor? Because that's all the boss had. He had the summary plan description that excludes contract laborers and independent contractors. He knew he wasn't either one of those things, okay? Now, it also says, or any other employee group or classification not eligible to participate in the plan. So their argument is, well, can I finish this point even though I'm running out of time? Their argument is a reasonable boss would have said, hmm, any other employee group or classification not to participate in the plan. Hey, could I get a copy of the plan? Because he didn't have it. And then they would see someone compensated by special fee, and they would realize that they're not eligible. Well, no. The whole reason under Kohler we're looking at the summary plan description is because the plan is ambiguous. So to follow their logic and just go from the summary plan description back to the plan would result in a never-ending loop of ambiguity and confusion. Thank you, Mr. O'Berke. Thank you. Thank you.